**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOYCE KEEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 15-cv-1178 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| MERCK SHARP & DOHME CORP., a | ) | |
| foreign corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Joyce Keen, filed a seven count First Amended Complaint, alleging disability

discrimination and failure to accommodate under the Illinois Human Rights Act ("IHRA"), 775

ILCS 5/1-101 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended,

including 42 U.S.C. § 12102 (Supp. 2009). She also alleges gender discrimination under IHRA and

Title VII, 42 U.S.C. § 2000(e), *et seq.* She further claims retaliation for exercising her rights under

these provisions.[1] Defendant Merck Sharp & Dohme Corporation ("Merck") moves for summary

judgment [144] in its favor on all counts. Merck further moves to strike Keen's Local Rule 56.1(b)(3)

response to Merck's L.R. 56.1(a) statement of undisputed material facts [161]. Keen moves to strike

new arguments Merck made for the first time in its reply in support of summary judgment [165]. For

the reasons stated herein, this Court grants Merck's motion for summary judgment and motion to

strike, and the Court denies Keen's motion to strike.

---

[1] This Court granted Merck's motion to dismiss count 7 under the Whistleblower Act as preempted by IHRA.

**Motions to Strike**

  *1. Keen's Motion to Strike Portions of Merck's Reply Brief*

  Keen moves to strike an argument that Merck raises in its reply brief. Keen asserts that Merck improperly argues at pages 15 through 19 of its reply brief that Keen raised for the first time an argument that Merck's human resources employee Geraldine Hamer threatened to terminate Keen if she persisted with her request for flex-time hours. Throughout this litigation Keen has maintained that Hamer retaliated against her by denying her request for flex-time. Merck argues in its reply that there is no admissible evidence in the record to support Keen's assertion that Hamer and Katherine Haeusel, another Merck employee, conspired and threatened to fire her for requesting early and late starts. Indeed, Keen's only proffered evidentiary support for this contention is her own statements in depositions and affidavits.

  Keen's assertion that portions of Merck's argument must be stricken is unpersuasive where Merck is responding to arguments made in Keen's response brief about the alleged conversation between Hamer and Haeusel intended to retaliate against Keen. In her motion to strike, Keen points to Hamer's deposition wherein she asked Hamer if, on April 21, 2015, she told Keen that she would be fired unless she returned to work without flex-time, to which Hamer responded "no." While this is an appropriate response to Merck's argument about the alleged Hamer-Haeusel conspiracy to terminate Keen, it is not sufficient basis to strike the entire argument from Merck's brief. *See Williams v. S. Ill. Riverboat/Casino Cruises, Inc.*, 553 F. Supp. 2d 1041, 1043 (S.D. Ill. 2008) (disregarding substantive arguments made in a motion to strike because they are "tantamount to a prohibited sur-reply brief."). This Court is capable of discerning the relative validity of arguments made in summary judgment motions. Keen's motion is therefore denied.

*2. Merck's Motion to Strike Keen's L.R. 56.1(b)(3) Response*

In section III of its reply brief, Merck moves to strike Keen's responses to its L.R. 56.1(a)

statement of material facts. Merck asserts that Keen's 56.1(b)(3) responses violate the local rule. In

*Malec v. Sanford*, the district court articulated the requirements for proper compliance with L.R. 56.1.

191 F.R.D. 581 (N.D. Ill. 2000) (Castillo, J.). The court explained:

> Local Rule 56.1(b)(3) governs the nonmovant's response to the movant's statement
> of facts and the nonmovant's statement of additional facts. This rule may be the
> most important litigation rule outside statutes of limitation because the consequences
> of failing to satisfy its requirements are so dire. Essentially, the penalty for failing to
> properly respond to a movant's 56.1(a) statement is usually summary judgment for
> the movant (at least if the movant has done his or her job correctly) because the
> movant's factual allegations are deemed admitted.

*Id.* at 583–84. "[A] general denial is insufficient to rebut a movant's factual allegations; the

nonmovant must cite specific evidentiary materials justifying the denial. If the cited material does

not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant

should provide an explanation." *Id.* at 584. "[A] district court is entitled to expect strict compliance

with Rule 56.1." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

Through this Court's review of Keen's responses to Merck's statements of fact it became

apparent that Keen did not comply with either the letter of the rule or the spirit of the rule. The

purpose of the Rule 56.1 "to require the parties to identify the disputed issues in a concise format—

would be defeated if the court were required to wade through improper denials and

legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*,

233 F.3d 524, 528–29 (7th Cir. 2000) (referring to L.R. 56.1's predecessor rule, the court affirmed

the district court's striking of the entirety of the nonmovant's responses). Each of Keen's responses

to Merck's statements of fact is a lengthy, in some instances exceeding three pages, multifaceted

motion filled with improper and unsupported factual assertions and baseless objections.

In many responses, Keen states the fact is disputed but restates the same proposition in a different way and thereby admitting that fact she purports to dispute. *See e.g.*, Pl.'s Response to Def.'s Statement of Facts ("DSOF"), Dkt. 150 at ¶ 33. In other instances, Keen disputes the statement, but only to add elaborative facts. *See e.g.*, DSOF, Dkt. 150 at ¶ 3. As courts in this district have emphasized, "Rule 56.1(b)(3)(B) 'provides the *only* acceptable means of ... presenting additional facts.'" *Malec*, 191 F.R.D. at 584 (quoting *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995))(emphasis added). Thus, this Court deems the following paragraphs admitted: 2-3, 5-6, 8, 10-19, 21, 23-27, 30-39, 45-48, and 50-65.

Further, Keen makes several foundation and hearsay objections to various documents that she claims lack authentication, including some that she produced in discovery. Courts will not sustain an objection to documents that the objecting party produced during discovery. *Vulcan Golf, LLC v. Google, Inc.*, 726 F.Supp.2d 911, 914 (N.D. Ill. 2010). Among her objections to authentication are documents attached to the declaration of Scott Lauer, Merck's Associate Director of North American Fleet Administration, that carry a "JK" bates label indicating that Joyce Keen produced the documents. "Even if a party fails to authenticate a document properly or to lay a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic." *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003), *aff'd*, 398 F.3d 620 (7th Cir. 2005).

In yet other responses, Keen objects but provides no citation to facts in the record. *See, e.g.*, Dkt. 150 at ¶¶ 9, 20, 28-29, 40-41, 52-53, 55, and 66. In response to paragraph 49, Keen states that the fact is disputed but she provides no basis or citation to demonstrate the dispute and her objection is purely argumentative. *Id.* at ¶ 49. In response to paragraph 56, Keen states the fact is disputed and proceeds to speculate that Dr. Nigro of Merck's Health Services department fabricated

the letter referenced to Keen's physician Dr. Mok after the fact without any citation to the record. *Id.* at ¶ 56.

For its part, Merck's Rule 56.1 statement of facts is imperfect. This Court therefore disregarded the following paragraphs that were not supported by the record citation or that this Court deemed immaterial: 15 (second sentence), 16, 27 (second and third sentence), 39, 40, 55, 56, 57 (the portion citing to exhibit M attached to Lauer's declaration, the Court was unable to find the exhibit), 58, and 59.

Accordingly, this Court grants Merck's motion. The following facts contained in Merck's Rule 56.1 statement of facts are undisputed: ¶¶ 1, 4, 7, 22, 42-43, 54 were expressly undisputed; 2-6, 8-14, part of 15, 17-21, 23-26, part of 27, 28-38, 41, 44-53, part of 57, 60-66 are deemed admitted based on the preceding discussion.

### 3. *Keen's L.R. 56.1(b)(3)(C) Statement of Additional Facts*

In an introduction to its response to Keen's statement of additional facts, Merck sets forth numerous reasons why this Court should not consider it. This Court agrees. "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument." *Malec v. Sanford*, 191 F.R.D. at 585. This Court spent a great deal of time reviewing Keen's statement of additional facts and the citations to the record accompanying each paragraph. First, the Court notes that Keen failed to comply with this Court's Order, allowing her twenty statements of fact in addition to the forty allotted by the rule. *See* Dkt. 131. By this Court's own count Keen presents 93 purported statements of fact, accounting for the paragraphs containing enumerated subparts. This Court may expect *strict* compliance with Rule 56.1. *Ammons*, 368 F.3d at 817. Keen's statement of additional facts does not even approach *substantial* compliance. Moreover, many of the purported factual statements are replete with improper argument, speculation, and are unsupported by the citations to the record

provided. *See, e.g.,* ¶ 31(a). Beyond these failures to comply with the Rule, many of Keen's factual assertions are supported only by her own testimony or affidavits, referring to facts that could not be within her personal knowledge. For purposes of an affidavit (or deposition testimony) "personal knowledge" may include inferences and opinions. *Visser v. Packer Engineering Assoc., Inc.,* 924 F.2d 655, 659 (7th Cir.1991) (citing *United States v. Giovannetti,* 919 F.2d 1223, 1226 (7th Cir.1990)). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *E.E.O.C. v. Admiral Maint. Serv., L.P.,* 174 F.R.D. 643, 647 (N.D. Ill. 1997) (internal citations omitted). Keen fails to comply with this basic stricture by making several statements regarding co-workers and supervisors' eligibility for bonuses and leave time without providing any foundation for her assertions. *See, e.g.,* ¶ 22. Because these issues permeate her Rule 56.1 statement of additional facts, this Court strikes the submission in its entirety.

**Background**

The following facts are undisputed for purposes of resolving this motion. Defendant Merck is a pharmaceutical manufacturer. (Def.'s Rule 56.1 Statement of Facts ("DSOF"), dkt. 146 at ¶ 2). Plaintiff Joyce Keen has been employed as a professional or executive customer representative promoting Merck's pharmaceutical products to health care providers since 1997. (*Id.*). Keen alleges that she is a disabled individual based on a diagnosis of cervical degenerative disc disease with radicular components. (*Id.* at ¶ 3).

As a customer representative, Keen promotes specific categories of Merck's pharmaceutical products, which Merck assigns, within a specific geographic area. (*Id.* at ¶ 4). Customer representatives also act as a primary point of contact for those products to the medical provider. (*Id.*). The particular product assignment is referred to as a representative's "bag structure" or

"product mix." (*Id.* at ¶ 6). Keen's testified that she had sold almost every drug in Merck's portfolio over the years. (*Id.*). In 2008, Merck assigned Keen to promote its diabetes products. (*Id.* at ¶ 7).

In June 2014, Merck restructured its organization, which included reduction and consolidation of its sales force in response to changes in the market. (*Id.* at ¶ 8). Merck laid off many customer representatives. (*Id.* at ¶ 9). Keen, Jason Puga, and a third customer representative were assigned to the Chicago South territory immediately prior to the June 2014 restructuring. (*Id.* at ¶ 10). This third customer representative was displaced in the restructuring, leaving Keen and Puga as the remaining customer representatives in the Chicago South territory. (*Id.* at ¶¶ 11-12). Merck also determined that only one customer representative was needed to promote the diabetes product line within the Chicago South territory, meaning that either Puga or Keen would be assigned to promote a different product line. (*Id.* at ¶ 13). Rob Church, a Director of Commercial Operations for Merck's Chicago South territory, testified that the Directors of Commercial Operations made the decisions about territory and bag structures for customer representatives, but ZS Associates ran algorithms based on criteria established by Merck to make recommendations for placement and displacement of customer representatives. (*Id.* at ¶ 14). Merck gave Directors of Commercial Operations the following rules for "swapping" bag structures: the representatives had to both already be assigned to the territory; they already had to be eligible for the cluster or territory; the swap could not create a hardship, such as travelling farther distances or create a vacancy. (*Id.*). As Director of Commercial Operations for the Chicago South territory, Church assigned Puga to promote the diabetes products and Keen to promote the cardiovascular products based on his assessment of their performance and customer overlap. (*Id.* at ¶ 15).

As a customer representative, Keen is paid an annual salary and may earn incentive compensation under a Sales Incentive Plan ("SIP"). Each year, a target SIP award is set and paid based on the representative's achievement of sales performance objectives. (*Id.* at ¶ 17). During the

relevant years, Keen's annual target SIP was $31,000, which constituted approximately 25% of her annual compensation. (*Id.*). Customer representatives are not eligible for incentive compensation in any month during which they are on unpaid leave and are also not eligible for incentive compensation if they are on paid leave for six or more consecutive months. (*Id.* at ¶ 18). Merck initially determined that Keen was ineligible for SIP awards during April and May 2013, but as Keen acknowledged in her deposition she did ultimately receive a SIP bonus for April. (*Id.* at ¶ 62).

Individual Business Results ("IBR") is a system of ranking performance based on pre-established metrics. (*Id.* at ¶ 63). Keen was ranked lower than Puga on an IBR rating in 2013, which she believes led to her receiving a lower percentage of her target bonus than Puga received in 2013. (*Id.*). Keen attributes the disparity in her IBR ranking to gender and disability discrimination and retaliation because she and Puga were promoting the same products in the same territory to the same medical professionals. (*Id.*). Merck attributes the disparity in IBR ranking to revisions that Puga made to his call deck (identifying the health care providers each called on). (*Id.* at ¶ 64). Keen and Puga's call decks were not identical because Puga revised his call deck to remove any outdated targets. (*Id.*). It is undisputed that these kinds of revisions to a customer representative's call deck impacted IBR their ranking. (*Id.*).

For the six-month semester ending December 2013 ("the Second Semester"), Keen and Puga each had promotional responsibility for diabetes products in the Chicago South territory and each earned a SIP bonus based on achievement of 83% of their shared performance target. (*Id.* at ¶ 19). For the six-month semester ending June 2014, while both still promoted diabetes products, Keen and Puga each earned a SIP bonus based on achievement of 120% of their shared performance target. (*Id.* at ¶ 20). For the six-month semester ending December 2014, Keen was promoting cardiovascular products and earned a SIP award based on achievement of 107% of her performance target. (*Id.* at ¶ 21). For that same period, Puga who was still promoting diabetes

products earned a SIP of 107% of his target. (*Id.* at ¶ 22). For the six-month semester ending June 2015, Keen, promoting cardiovascular products received a SIP award of 116% of her target performance. (*Id.* at ¶ 23). For that same period, Puga, promoting diabetes products received a SIP award for achieving 46% of his target. (*Id.* at ¶ 24). For the semester ending in December 2015, Keen received a SIP award for achieving 104% of her target. (*Id.* at ¶ 25). For the same semester, Puga earned a SIP award of 65% of the target. (*Id.* at ¶ 26). Seventy percent of Puga's award was weighted based on his promotion of diabetes products and the remaining thirty percent was based on his promotion of insomnia products. (*Id.*).

*2013 Accommodation Request (Vehicle I)*

Merck provides its customer representatives with a company car to use for work. (*Id.* at ¶ 27). Depending on the mileage driven, representatives typically get a new car every two to three years. (*Id.*). In its fleet, Merck maintains several models of approved "medical exception vehicles." (*Id.* at ¶ 28). Employees must request a medical exception by submitting an Alternative Vehicle Request form. (*Id.*). Merck's Health Services Department evaluates the medical documentation provided by the employee and the request for an Alternative Vehicle. (*Id.*). Merck's Health Services Department consults with the employee's doctor about the request as necessary and makes a recommendation to Merck's fleet department about which vehicle is recommended as a medical exception vehicle. (*Id.*). Merck's fleet department procures the exception vehicle for the employee in consultation with the Health Services department about vehicle attributes within the fleet, and communicates its recommendation to the employee. (*Id.*).

In 2008, Keen requested and was approved for a medical exception vehicle. (*Id.* at ¶ 29). On February 13, 2013, Keen inquired about getting a different medical exception vehicle and was directed to the Alternative Vehicle Request process. (*Id.* at ¶ 30). Keen submitted the form with a doctor's note stating that Keen needed a "larger vehicle with better suspension to absorb bumps."

(*Id.*). On March 5, 2013, Dr. Ruth Kerr, one of Merck's Health Services doctors, reviewed Keen's request and approved her for a Ford Escape, Chevy Equinox, or equivalent vehicle when she was next due for a new vehicle, which Dr. Kerr believed was sometime that year and it was that year. (*Id.* at ¶¶ 31-32). On August 21, 2013, Keen contacted Merck's Fleet Management about the selection of her new medical exception vehicle and informed Merck that the fleet vehicles did not meet her needs. (*Id.* at ¶ 34). Keen suggested a Ford Explorer Limited, a Ford Flex, or a Chevy Traverse would be suitable because they each had a headrest that adjusts both vertically and horizontally. (*Id.*). On or about August 27, 2013, Scott Lauer, Merck's Fleet Manager, contacted Dr. Kerr to have her review the request and opine as to whether a custom-ordered vehicle outside the fleet was warranted based on the medical information provided by Keen's doctor. (*Id.* at ¶ 35). Dr. Kerr reviewed the March 2013 Alternative Vehicle Request form and the accompanying physician's note and, after discussing it with her colleague Dr. Nigro, she concluded that Keen's request could be met with either the Ford Escape or the Chevy Equinox from within the fleet. (*Id.*). On or about August 29, 2013, Merck requested additional, updated medical documentation from Keen to support her request for the Traverse or other non-fleet exception vehicle. (*Id.* at ¶ 36). On September 10, 2013, Merck received a new request form from Keen, including updated medical documentation form her physician stating that she needed a "four-way adjustable headrest." (*Id.* at ¶ 37). On September 13, 2013, Dr. Kerr approved Keen's request for a vehicle with a four-way adjustable headrest. (*Id.* at ¶ 38). On October 8, 2013, Merck approved Keen's request for a rental vehicle to use until her approved Chevy Traverse arrived. (*Id.* at ¶ 41).

*2013 Claims of Inequitable Treatment*

Keen makes several other claims of inequitable treatment by Merck. In September 2013, Keen filed an internal ethics complaint based on an OSHA-related form that Keen's manager (Matt Snyder) submitted regarding a "near-miss" car accident involving Keen. (*Id.* at ¶ 65). The OSHA-

related form, which Keen asserts included inaccurate information, had no impact on the approval or denial of Keen's workers' compensation claim, short term disability benefits, or SIP award eligibility. (*Id.*). Keen attributes the inaccuracies to discrimination by her manager. (*Id.*).

In November 2013, Keen's manager denied her request for vacation time off based on a mistaken belief that Keen did not have sufficient vacation time available. (*Id.* at ¶ 60). Keen further complains that Merck did not select her for a corporate "VIP" ride along. (*Id.* at ¶ 61). Customer representatives are not evaluated based on a "VIP" ride along and there is no additional compensation tied to being selected. (*Id.*). Keen believes she was denied these vacation benefits and networking opportunities because she was a woman, disabled, and had requested accommodation. (*Id.* at ¶¶ 60-61).

*2015 Accommodation Request (Lifting Restriction, Use of a Cane, and Flexible Schedule)*

In October 2014, Keen took a medical leave of absence to have surgery and did not return to work until April 2015. (*Id.* at ¶ 42). On April 7, 2015, Keen submitted a return-to-work note from her doctor stating that Keen could return to work on April 8, 2015, with three restrictions: (1) "Lifting restriction to 15 lbs rarely"; (2) "Allow early or late start"; and (3) "Patient sometimes uses a cane for lower extremities." (*Id.* at ¶ 43). On April 17, 2015[2], Merck spoke with Keen on the telephone regarding her doctor's recommendation that she be allowed "early and late starts" and informed her that the company could not grant her request to either start late or end her workday early at her discretion without additional information about what that meant. (*Id.* at ¶ 44). Keen informed Merck that she wanted the flexibility to manage her pain and traffic within her territory. (*Id.*). She also informed Merck that she believed she had similar restrictions and accommodations in the past. (*Id.*).

---

[2] Although defendants refer to 2017 as the date, this Court believes that was simply a typographical error since the surrounding statements refer to April 2015.

On April 22, 2015, Merck concluded that it could accommodate Keen's restrictions with the exception of the "early and late starts," for which it lacked sufficient information. (*Id.* at ¶ 45). As an alternative accommodation, Keen could remain off work on long-term disability leave, which had been approved. (*Id.*). On April 24, 2015, Merck informed Keen by email of its decision regarding her restrictions, including the alternative that Cigna, their insurance carrier, had approved her for long term disability. (*Id.* at ¶ 46). Merck further informed Keen that she should submit additional medical documentation for her "early and late start" request by April 30, 2015. (*Id.*). On April 28, 2015, Merck received a new note from Keen's physician, stating that she could return to work with the lifting restriction and the cane usage, which had already been approved as accommodations. (*Id.* at ¶ 47). Merck received no further information to support her request for "early and late starts." (*Id.* at ¶ 48). Keen returned to work the following day. (*Id.* at ¶ 49).

*2015 Accommodation Request (Vehicle II)*

On July 13, 2015, Keen submitted a new Alternative Vehicle Request form, asking for a Chevy Tahoe. (*Id.* at ¶ 51). Merck denied the request on July 30, 2015, because the "requested vehicle is not the approved medical alternative vehicle, and is not justified by the stated medical condition. Further medical information supporting why that specific vehicle is requested over current, low mileage Traverse must be supplied in order to be considered." (*Id.* at ¶ 52). On July 31, 2015, Merck explained to Keen that it needed further information from her doctor as to why the Tahoe was a better accommodation for her condition than the Traverse because the Traverse has a four-way adjustable headrest, while the Tahoe does not. (*Id.* at ¶ 53). Merck also informed Keen that the Chevy Tahoe had not been evaluated or approved as a medical exception vehicle in Merck's fleet. (*Id.*).

On August 11, 2015, Keen submitted a revised request for the Tahoe or a vehicle with the same headrest because the Traverse causes Keen pain and paresthesia. (*Id.* at ¶ 54). In September

2015, Dr. Nigro, of Merck's Health Services department, spoke with Keen's physician Dr. Mok about Keen's Tahoe request. (*Id.* at ¶ 56). Dr. Nigro memorialized his understanding of the conversation in a letter to Dr. Mok dated September 18, 2015, stating:

> I understand that when you filled out the Merck Alternative Vehicle Request Form… you felt that provision of the Chevrolet Tahoe was not specifically required, but rather the equivalent of the Tahoe seat was your recommendation/requirement. You mentioned that you did not have any knowledge or information relative to the seat specifications. Rather, in speaking to Ms. Keen, she indicated to you that when she sat in the driver's seat of a Chevy Tahoe in the course of exploring other vehicles, she 'felt better'. In addition, you stated that you expected your recommendation to be interpreted and implemented by a specialist such as an Occupational Health-trained Physician, such as myself.

(*Id.*). On September 29, 2015, Merck informed Keen that Merck would not be replacing her Traverse with a Tahoe because it was unable to discern any appreciable difference in the seat between the two vehicles. (*Id.* at ¶ 57). As an alternative, Merck offered to repair the seat in her Traverse if it was defective or allow her to use a personal vehicle and receive reimbursement for mileage. (*Id.*).

Keen testified in her deposition that no one at Merck expressly told her that any of the alleged incidents were based on her gender, disability, or in retaliation for requesting accommodations. (*Id.* at ¶ 66.). Following her Equal Employment Opportunity Commission ("EEOC") charges, Keen filed the instant lawsuit alleging gender and disability discrimination and retaliation for requesting disability accommodations.

**Legal Standard**

Summary judgment is proper when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017), *reh'g denied* (Mar. 27, 2017) (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)); Fed. R. Civ. P. 56(a). In deciding whether summary judgment is appropriate, this Court accepts the nonmoving party's evidence as

true and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

**Discussion**

Merck moves for summary judgment in its favor on all counts, arguing that the undisputed facts establish that it is entitled to judgment as a matter of law. Keen raises three basic claims: (1) gender discrimination based on her removal from Merck's diabetes product line while her male counterpart was kept on the diabetes product line, and giving him higher performance ratings; (2) failure to reasonably accommodate her disability by providing appropriate transportation, leave time, and flex time benefits, depriving her of bonus remuneration; and (3) retaliation for persisting in her request for flex time hours. The Court will address each claim in turn.

   *1. Gender Discrimination and Disability Discrimination*

Merck moves for summary judgment on Keen's gender and disability discrimination claims, arguing that the undisputed facts demonstrate that Keen suffered no adverse employment action and she fails to present evidence that similarly situated individuals, who were not disabled women, were treated more favorably. This Court will address Keen's discrimination claims together since she does little to differentiate between them, alleging that defendant discriminated against her as a disabled woman. Title VII and the ADA, as amended, provide the general prohibitions on the discrimination of members of protected classes.

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" based on the individual's sex. 42 U.S.C. § 2000e–2(a)(1). Generally, a plaintiff must show that "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the

employer." *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

The ADA, as amended, similarly prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to… advancement, or… employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "To prove a violation of § 12112(a), a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 503 (7th Cir. 2017) (quoting *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)). To establish the third prong, Keen must show a genuine issue of material fact exists regarding whether her disability was the "but for" reason for the adverse action. *Monroe*, 872 F.3d at 504. Like gender discrimination, Keen must show that similarly situated individuals who are not disabled were treated better to establish the correlation between her status as a disabled individual and the adverse action. *Id.* Courts evaluate discrimination claims under the IHRA under the same framework. *Rabe v. United Airlines, Inc.*, 971 F.Supp.2s 807, 821 (N.D. Ill. 2013) (Pallmeyer, J.) (citing *Zaderaka v. Ill. Human Rights Comm'n*, 131 Ill.2d 172, 178, 137 Ill. Dec. 31, 545 N.E.2d 684, 687 (Ill. 1989)).

There is no dispute here that Keen is a woman and is disabled within the meaning of the ADA. Therefore, the two issues for the Court to resolve are (1) whether Merck subjected Keen to an adverse employment action; and (2) whether similarly situated employees outside of her protected class were treated more favorably by Merck.

*(a) Adverse Employment Action*

"In a discrimination case, a materially adverse employment action is one which visits upon a plaintiff a significant change in employment status. Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading,

unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (internal citations omitted). Keen fails to establish any adverse employment action.

Keen asserts that her reassignment to the cardiovascular product line following the 2014 restructuring at Merck was a demotion that resulted in lower SIP awards and a loss of prestige. A lateral transfer to a position that does not involve a demotion in form or substance is not a materially adverse employment action. *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). "A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." *Id.* Keen insists that the change to her bag structure, removing her from the diabetes product line and assigning her to cardiovascular medication and other products, was a demotion. However, her compensation structure did not change and her territory did not change. "Whether a reassignment would be a promotion, demotion or lateral transfer is not determined by the employee's perceptions." *Brown v. Milwaukee Bd. of School Directors*, 855 F.3d 818, 827 (7th Cir. 2017).

In *Williams*, the plaintiff was complaining of a transfer as a salesperson from the Squibb division to the Mead Johnson division of pharmaceutical manufacturer Bristol-Myers Squibb Company. The court there found that Williams' transfer between divisions was a strictly lateral reassignment. *Williams*, 85 F.3d at 274. The court acknowledged that any transfer for a commissioned salesperson would mean initially less pay and yet still held that it did not rise to the level of a materially adverse employment action. *Id.*

Keen also asserts that the loss of her May 2013 SIP bonus due to her medical leave and Merck's alleged refusal to allow her to retroactively apply benefit time to become SIP eligible were adverse actions. The Seventh Circuit consistently holds that "the loss of a bonus is not a materially adverse employment action." *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (the

plaintiff's loss of bonus was not an adverse employment action where it was discretionary based on performance); *Palermo v. Clinton*, 437 Fed. Appx. 508, 511 (7th Cir. 2011) (the plaintiff's loss of one year's bonus despite having received the annual bonus every other year was not an adverse employment action); *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996) (loss of a performance rating based bonus was not an adverse employment action). Although Keen argues that her SIP bonus was not discretionary, it is undisputed that the amount of a bonus is determined by performance and that she had to work a certain amount each month to be eligible. Thus, the loss of SIP eligibility in May 2013 is not a materially adverse employment action.

Keen's subjective assertions that the reassignment from promoting diabetes products and not being selected for VIP corporate ride alongs resulted in a loss of advancement opportunity and prestige. While the loss of career advancement can constitute an adverse employment action, the evidence in the record here does not support such a conclusion. In *Lewis v. City of Chicago*, on which Keen relies for support, the court found that the loss of a training opportunity and two days overtime pay was sufficient to raise a genuine issue of material fact as to whether she experienced an adverse employment action. 496 F.3d 645, 654 (7th Cir. 2007). There, the plaintiff was a female police officer who claimed that she was denied a training opportunity because she was a woman that would allow her to be staffed at recurring large scale public gatherings. *Id.* at 653. The court found that loss of training was a lost opportunity for career advancement. *Id.* at 654. Ms. Lewis was able to connect the financial loss of two days overtime from the one training event to potential losses in compensation because of type of specialized training, allowing her to be assigned to large-scale public events and earn significant overtime pay. *Id.*

Here, Keen has not identified any comparable opportunity for career advancement that has been lost. In fact, she touts the awards and accolades that she received from her supervisors and the company. While the Court is not oblivious to the importance, and often intangible, benefits to

networking in the corporate world, here there is no record evidence that Keen's career suffered as a result of an opportunity denied her. Rather than a concrete training or promotion opportunity that would translate into tangible financial losses, Keen asserts the loss of prestige and intangible networking benefit from not being selected for a VIP corporate ride along. She also fails to draw any connection between that lost opportunity and her gender as in *Lewis*. "[N]ot everything that makes an employee unhappy will suffice to meet the adverse action requirement." *Traylor v. Brown*, 295 F.3d 783, 788-89 (7th Cir. 2002). Accordingly, this Court finds that Keen fails to demonstrate a genuine issue of material fact as to whether she suffered an adverse employment action.

This Court could stop the discrimination analysis here because the failure to make a sufficient showing on any one essential element on which the party bears the burden of proof "renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nevertheless, the Court will consider whether the record contains evidence of similarly-situated individuals that were treated more favorably.

*(b) Similarly Situated Individuals*

To establish a prima facie case for discrimination, Keen must also present evidence that a similarly situated non-disabled male customer representative at Merck was treated more favorably. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). A similarly situated employee must be "directly comparable" to the plaintiff "in all material respects." *Id.* (internal quotation marks omitted). The Court uses a common sense approach to determine whether the proposed comparator is suitable, considering factors such as: whether they held the same position, had the same supervisor, were subject to the same standards, and engaged in similar conduct. *Id.*

Keen refers to David Hass as a comparator. Hass was a customer team leader for Merck beginning in 2010, and was Keen's supervisor. He suffered a shoulder injury and, according to Keen was allowed to work from home and was not placed on unpaid leave. Hass is not a suitable

comparator since he is not directly comparable in all material respects. As her supervisor, he did not hold the same position as Keen and there is no evidence that he would have been held to the same standards. There is some testimony in the record from Hass that he suffered an injury to his shoulder and was off work for about a week, but there is no evidence that he was placed on any type of leave or what the other circumstances were around his injury.

Jason Puga is also a poor candidate for comparison. While Puga held the same position as Keen, there is no evidence that he took leave of any kind and still received a bonus. The record evidence demonstrates that, contrary to Keen's assertion, Puga's SIP award diminished when Merck restructured and kept him on the diabetes product line. Thus, Keen fails to present sufficient evidence of a similarly situated individual to create a genuine issue of material fact.

### 2. *Failure to Accommodate*

Merck also moves for summary judgment on Keen's failure to accommodate her disability claim. "A plaintiff claiming failure of reasonable accommodation must show: '(1) [s]he is a qualified individual with a disability; (2) the employer was aware of [her] disability; and (3) the employer failed to reasonably accommodate the disability.'" *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015) (quoting *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013)). For purposes of its motion, Merck does not dispute that Keen is a qualified individual with a disability. Merck argues that it reasonably accommodated Keen's disability by providing the vehicle that she requested (the Chevrolet Traverse) and granting her medical leave. Although Keen requested a second, different vehicle (a Chevrolet Tahoe), Merck declined to fulfill the request without additional medical documentation. Keen's physician Dr. Mok provided some additional documentation; however, he did not state why the Tahoe was more suitable than the Traverse other than to say the Traverse was causing Keen pain. "[I]f the employee 'does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to

accommodate the disabled employee.'" *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 821 (7th Cir. 2017) (quoting *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 702 (7th Cir. 2014), citing *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).

Similarly, Merck argues its request for additional clarification of her request for "early and late starts" cannot be a failure to accommodate when Merck had not denied the request and Keen returned to work without restrictions. *See Ekstrand v. School Dist. Of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) ("[T]he ADA demonstrates that a reasonable accommodation is connected to what the employer knows about the employee's precise limitations. See 42 U.S.C. § 12112(b)(5)(A)."). Although Keen argues that Merck's denial of "early and late starts" was an improper failure to accommodate, she relies on the undisputed fact that Merck granted her flex-time in the past. This fact however does not support an inference that Merck was required to always provide the same accommodation whenever requested.

The record shows that Geraldine Hamer, Merck's human resources employee for workplace accommodations, sent Keen an email on April 24, 2015, with regard to the "early and late starts." In her email, Hamer explained that the request "is not sufficiently defined. In order for Merck, through the interactive process, to ascertain the impact on the business or how the business might work within this request to achieve a consistent and reliable presence in the territory, we need additional information… For example, there is no understanding of how early or how late you may need to arrive or depart from your territory, and there is no frequency indicated." Dkt. 146-28, Ex. 25-B. The record indicates that Dr. Mok sent a return to work letter on April 28, 2015, with only the lifting and cane restrictions. The email further indicates that Keen may supplement her request with additional information from her physician. *Id.* "[I]dentifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process." *Brown*, 855 F.3d at 824. Keen's failure to provide further information to Merck to support her

requested accommodation means she "failed to hold up her end of the interactive process. *Id.* Accordingly, this Court finds that Merck is entitled to summary judgment on this issue.

### 3. *Retaliation*

To establish retaliation based on a disability, Keen must present evidence, direct or circumstantial of an adverse employment action causally connected to a protected activity, for example complaining about a lack of accommodation. *See Anderson v. Donahoe*, 699 F.3d 989, 994-995 (7th Cir. 2012). In the context of retaliation the standard to determine whether an action is adverse is whether it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss*, 816 F.3d at 918. Merck argues that it is entitled to judgment as a matter of law on Keen's ADA retaliation claim because Keen cannot establish that she suffered an adverse employment action causally related to a protected activity. Keen's scattershot argument, which seems to just throw everything at the wall and see what sticks, makes it difficult for this Court to discern precisely what she is claiming as her protected activity. It appears that Keen claims that Merck generally retaliated against her in every way, but this Court's examination of all the submissions of the parties suggests the only possible claim for retaliation relates to Keen's request for flex-time.

Keen asserts that Geraldine Hamer threatened to terminate her employment if she persisted in her request for flex-time accommodation. The only evidence she offers to support this contention is her own deposition and affidavit. Hamer denied making any such threat, and the documentary record shows that Merck offered to continue the interactive process on that request. Keen's self-serving deposition testimony standing alone is insufficient to demonstrate a causal link between her continuing request for flex-time and the denial of it. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (finding that self-serving statements in an affidavit or deposition "will not defeat a motion for summary judgment *when those statements are 'without factual support in the record.'"*)

(emphasis in original)); *see also Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 709 (7th Cir. 1995) (finding that the plaintiff failed to establish a prima facie case of retaliation where it was based solely on her own deposition without any corroborating evidence).

Even when viewing the evidence in the light most favorable to Keen, the record demonstrates that Merck sought more documentation for Keen's flex-time request and, rather than provide further medical support and specification of her requested accommodation, Keen returned to work without that accommodation. Although Keen makes much of Merck's human resources employee Katherine Haeusel, stating that Keen "was on her radar," there is no evidence that Haeusel denied her flex-time or ratified the alleged threat. Similarly, in *Koelsch*, the court found the plaintiff's testimony insufficient by itself to support a retaliation claim, where she asserted that her supervisor at the time "told her that the 'handwriting [was] on the wall' and implied that she should begin seeking employment elsewhere." *Koelsch*, 46 F.3d at 708. There the plaintiff testified that when she asked her supervisor if his comments had anything to do with her reporting the company president's advances, he answered in the affirmative. *Id.* The causal link between Keen's claimed adverse employment action and protected activity are even more tenuous than in *Koelsch*. Accordingly, this Court finds Keen fails to demonstrate a genuine issue of material fact on her retaliation claim.

**Conclusion**

Based on the foregoing discussion, this Court grants Merck's motion for summary judgment [144] and denies Keen's motion to strike [165]. Civil case terminated.

IT IS SO ORDERED.

Date: 3/5/2018

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge